IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Equal Employment Opportunity Commission, | |
| **Plaintiff,** | Case No. 2:14-cv-1696 |
| **v.** | Judge Graham |
| East Columbus Host, LLC (d/b/a Texas Roadhouse), and Ultra Steak, Inc., | Magistrate Judge Jolson |
| **Defendants.** | |

## Opinion & Order

"You just don't get my humor." (Lappert Dep. at 112:9–13, Doc. 129-5). Brian Price was only joking, except on the rare occasion that a female accepted his sexual advances, in which case he was quite serious. The Plaintiff presents evidence that Price, a restaurant manager in his late 30s, sexually harassed young women and girls at a Texas Roadhouse restaurant for three years before being fired. He hired young women he thought sexually attractive, incessantly talked about sex with female employees, offered favorable treatment on the job in exchange for sexual favors, and he poked, hugged, held, kissed, and propositioned many of the young women. In short, Brian Price took advantage of his position of leadership and created a culture of fear. He humiliated and intimidated many of the women who worked for him. Some complained, but were quickly shut down; others tolerated his behavior because they were too young to know how to properly respond or because they needed the job too bad to quit.

The Equal Employment Opportunity Commission (the EEOC) on behalf of 12 named complainants and a class of similarly situated women, bring claims for sexual harassment and retaliation in violation of Title VII against East Columbus Host, LLC (d/b/a Texas Roadhouse) and Ultra Steak, Inc. (collectively, Defendants). Defendants move for partial summary judgment on the claims of 10 of the twelve women, (Doc. 119), but because there are genuine issues of material fact for all but a few of the claims, that majority of that motion is **DENIED**.

## I) Background

### A) Factual background

The facts are too many to state, as is evident from the EEOC's 377-page brief. But here are the basics. Eric Price was the "managing partner" at a Texas Roadhouse restaurant in Reynoldsburg, Ohio. He started sexually harassing women and girls shortly after he started working there. It continued, if you believe the complaints, almost constantly until he was fired. Defendants fired Price after receiving numerous complaints about him during a three-and-a-half year period.

The EEOC brings this case on behalf of twelve women: Bonnie Rene Fagan, Brandy Jones, Fawn Leathers, Courtney Faller, Lindsay Stover, Ashley Harry, Mirinda Heightland, Cheyenne Johnson, Savannah McGrath, Michelle Hessler, and Kathleen Brown (collectively, the complainants). The complainants provide evidence that Price sexually harassed them—alleging both *quid pro quo* and hostile-work-environment harassment—retaliated against their efforts to complain about that harassment, and in some cases made their work so intolerable that they quit. The severity of harassment varies from woman to woman, but all testify that Price harassed them, and all testify that they witnessed him continually harass other women in the restaurant. Most of the complainants either quit or transferred to other locations. Nearly all of the women testified that they tried to shrug off Price's behavior and still do their job, but nearly all of them also testified that because of him, they dreaded coming to work.

### B) Procedural history

Cynthia Rieser filed a charge of sex discrimination against Texas Roadhouse with the EEOC in March 2010. In 2012, an EEOC investigator informed Texas Roadhouse that she would recommend a finding that Riser was sexually harassed, retaliated against, and forced to resign. In 2013, a different EEOC investigator informed Texas Roadhouse that he would soon recommend a finding that Defendants violated Title VII by subjecting Rieser and a class of females to sexual harassment and retaliation. In that letter, Defendants were invited to provide additional information, but Defendants did not, claiming they could not unless they knew the identity of the other women in the alleged class. The EEOC did not provide the names of other women, instead issuing a Determination that Defendants were liable for violations of Title VII. In January 2014, the EEOC submitted its only demand letter on behalf of the class of women it claims were harassed and retaliated against while working for Defendants. Receiving no acceptance from De-

2

fendants, in February 2014, the EEOC sent Defendants a notice that conciliation efforts had failed. The EEOC filed this lawsuit in September of 2014. Discovery ensued.

Defendants filed their motion for partial summary judgment in July 2016. The EEOC filed a response, which Defendants move to strike. The Court granted Defendants an extension of time to file their reply brief, but after considering the record and the arguments, the Court deems a reply unnecessary to deciding Defendants' motion.

## II) Discussion

Defendants move for partial summary judgment on a variety of the claims presented, but the Court will only grant the motion as to four retaliation claims and three constructive-discharge claims, denying the balance. First, the Court analyzes the retaliation claims, including those that do not present a genuine issue of material fact; second, the Court analyzes a variety of global defenses or arguments applicable to several or all of the complainants.

### A) Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary material in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant

probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

**B) Retaliation Claims**

To establish a prima facie case of retaliation under Title VII, "an employee must establish that (1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008). Protected activity is not limited to formal or even informal complaints to supervisors; even "a demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015). That "demand" may include resistance or confrontation. *Id.*

Defendants' argue the Court should reject most of the retaliation claims because the complainants failed to engage in any protected activity. For three of the complainants, they are right. But most of the complainants either complained about Price's behavior directly to Price or through other channels (for example, to other local managers, corporate personnel, or HR hotlines), and their testimony presents a genuine issue of material fact on whether they engaged in protected activity. But Stover, Brown, and Fagan all fail to present colorable evidence that they

engaged in even the most basic of protected activity – they did not resist or confront Price on his behavior. Therefore, Defendants motion is GRANTED as to these three retaliation claims.[1]

But the other retaliation claims survive. In the closest case, Mirinda Heightland never directly opposed or confronted Price on his behavior, instead laughing it off and tacitly refusing to go along with his sexual innuendos and advances. This presents thin evidence of protected activity, but Price himself interpreted her "laughing it off" as resistance because he eventually asked her why she continued to resist him and then arguably punished that resistance by refusing her requested time off. The rest of the retaliation claims exhibit a pattern of women complaining about sexual harassment through corporate channels that ultimately got back to Price and he punished the complainer in some way. Because these retaliation claims present a genuine issue of material fact, these claims will proceed to trial.

### C) Hostile Work Environment

Defendants raise two issues to oppose the EEOC's hostile-work-environment claims: first, that the conduct was not severe or pervasive, and second, that the complainants' work performance was not affected by the conduct. Since the evidence presents a genuine dispute of material fact on both issues, summary judgment is not appropriate.

In order to establish a hostile work environment claim, plaintiff must show: (1) that he was a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's protected status; (4) the harassment unreasonably interfered with plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). The Court's inquiry in this section focuses on the fourth element.

If harassment is severe or pervasive it creates an objectively hostile work environment, thus altering the conditions of employment. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998); *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 707 (6th Cir. 2007). The issue of whether a plaintiff suffered a hostile work environment involves both an objective component that asks whether a reasonable person would find the environment hostile and abusive, and a subjective component that asks whether plaintiff subjectively viewed that environment as abusive. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). Factors to consider include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humili-

---

[1] The Court dismisses a fourth retaliation claim for other reasons discussed later.

ating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). "Simple teasing, ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

But here, the Court isn't presented with a few incidents over a long period of time. Price's conduct and words weren't just "crude, offensive, and humiliating," *Williams*, 187 F.3d at 563, Price's conduct with a number of the women contained an element of physical invasion, *id.* In summary, some of Price's conduct was severe (e.g. threatening, while standing between the smaller employee and the door, to fire her if she didn't perform sexual favors for him), some of it was pervasive (e.g. near constant tickling, poking, sexual innuendo, running commentary on employees' sex lives). It all adds up to create more than a genuine issue of material fact as to the existence of a hostile work environment for the women named in the complaint.

Second, Defendants argue that many of the hostile-work-environment claims should be dismissed because the complainants don't show that the environment interfered with their ability to do their jobs. And this hones in on the subjective element of the inquiry, because "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). To show that severe or pervasive harassment unreasonably interfered with an employee's work performance, "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. The employee need only show that the harassment made it more difficult to do the job." *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988). Further still, the plaintiff need not show "concrete psychological harm" like a serious effect on her psychological well-being or that she suffered injury. *Harris*, 510 U.S. at 22. In short, this test cannot be "a mathematically precise test," and can only be "determined by looking at all the circumstances." *Id.* at 22 & 23.

In sum, the focus of the objective/subjective inquiry should remain on (1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct "severe or pervasive." "It would be error to require that the plaintiff establish that her work was 'affected' by the harassment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 567–68 (6th Cir. 1999). A plaintiff can establish a prima facie case by showing that

"the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive . . . ." *Clay*, 501 F.3d at 706 (quoting *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). In short, the complainants may not present evidence that their tangible productivity declined, but they don't have to, and their testimony presents a genuine issue of fact as to whether the treatment changed the conditions of their employment.

The evidence shows a genuine issue of material fact as to this issue; therefore, these claims survive summary judgment.

### D) The *Faragher/Ellerth* defense

The law imposes strict liability on employers for the harassing conduct of their supervisors if the employee suffered a negative tangible employment action, like a demotion, discharge, or undesirable transfer. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 & n.1 (6th Cir. 2005). But even when an employee doesn't suffer a negative tangible employment action, she can still make a claim for sexual harassment. In that case, an employer may establish the so-called *Faragher/Ellerth* affirmative defense by showing: (1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and ([2]) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Clark*, 400 F.3d at 348 (quoting *Faragher*, 524 U.S. 775, 807–08 (1998)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). The employer can't benefit from this defense unless it proves both prongs. *Clark*, 400 F.3d at 349.

First, did Defendants satisfy their duty to reasonably prevent and promptly correct the harassment? The analysis ends here. Defendants make the most of the sexual harassment policies and training they had in place, on paper. But their duty doesn't end there. *Clark*, 400 F.3d at 349. The Court must look "behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." *Id.* "[R]egardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future." *Clark*, 400 F.3d at 349.

Even if none of the women can show a negative employment action, and that they all unreasonably failed to take advantage of any preventative or corrective opportunities, and that their employer promulgated an effective sexual harassment policy on paper—and that's assuming a

lot—there is still a genuine issue of material fact of whether Defendants exercised reasonable care to correct promptly any sexually harassing behavior.

Here, the EEOC describes a pattern of complaints by female employees under the supervision of Eric Price that started less than a month after he began as the managing partner at the Reynoldsburg Texas Roadhouse. These complaints usually led to someone from the corporate office contacting Price, occasionally in person where they would interview staff members to try and gather more information. None of these complaints resulted in serious disciplinary action. It took video footage of Price inappropriately touching a 17-year-old hostess for his employer to fire him, and this in May 2011. But less than a month into his tenure, Price made sexual remarks to another high-school aged hostess while looking at naked pictures of her on her phone without her permission. That hostess, Ashley Harry, did complain, and the only response she got was not from the corporate office, but from the very person she feared: Eric Price. Price surmised that Harry was the one who complained, so Price confronted her, telling her to not get other people involved if she had a problem but to come to him directly. Construing the evidence most favorably to the EEOC, a jury could see this as the first failure in a long line of tepid responses in the face of near constant complaints, bookended by sexual harassment of teenage girls.

Even assuming for the sake of argument that none of the women ever reported any harassment nor complained, because there is a genuine issue of material fact as to whether Defendants took reasonable care in promptly correcting the alleged sexual harassment, the Court will not grant summary judgment on the *Faragher/Ellerth* affirmative defense.

### E) Aggregating claims

Here, Defendants make a point about the decision-making process. Taken together, complainants' experiences are overwhelming, providing perspectives of a dozen women at various times who all testify to working in a similarly hostile environment. But considering each discrete claim in isolation, Defendants argue, reveals that many of the complainants do not testify to severe or pervasive treatment. Perhaps, but determining whether a hostile work environment existed requires a look at the totality-of-the-circumstances test. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). "[A]n employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." *Meritor*, 477 U.S. at 65–66. So, courts need not myopically focus on only harassment directed at individual plaintiffs, but may consider the harassment

that each plaintiff experienced, witnessed, and knew about because all three could contribute to a hostile work environment. *See Jackson*, 191 F.3d at 661. *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 718 (6th Cir. 2012) ("In short, a plaintiff does not need to be the target of, or a witness to harassment in order for us to consider that harassment in the totality of the circumstances; but he does need to know about it.").

Here, each woman named in the complaint experienced direct harassment, witnessed harassment, and knew about harassment of people like them: young women who worked at the Reynoldsburg Texas Roadhouse. While the Court does not aggregate all the evidence to make a finding of a hostile work environment, the Court does consider what each woman experienced, witnessed, and knew about.

### F) Constructive discharge

Constructive discharge is a claim distinct from the underlying discriminatory act. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004) (holding that a hostile-work-environment claim is a "lesser included component" of the "graver claim of hostile-environment constructive discharge"); *see also Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016). To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions. *Id.*

Defendants' motion for summary judgment is granted as to the following complainants' constructive discharge claims:

Stover: the evidence shows that Defendants took little employment action adverse to Stover, and her own testimony provides overwhelming evidence for the reason for her resignation—her other job and other commitments.

Fagan: Fagan did not quit; she transferred to a different Texas Roadhouse restaurant. And while a transfer may constitute a constructive discharge if the particular reassignment is materially adverse, here, the EEOC provides no evidence that this transfer was materially adverse to Fagan. *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 919 (6th Cir. 2014) (must show "some level of objective intolerability"). Barring unusual circumstances, proof of which is lacking here, a transfer at no loss of title, pay, or benefits does not amount to a constructive discharge

or adverse employment action. *Darnell v. Campbell Cty. Fiscal Court*, 731 F. Supp. 1309, 1313 (E.D. Ky. 1990), *aff'd*, 924 F.2d 1057 (6th Cir. 1991). Fagan and Price's sexual relationship may have precipitated Fagan's transfer request, but it wasn't Price's way of forcing Fagan to quit.

Jones: she transferred to another Texas Roadhouse restaurant the same distance from her house. Jones presents no evidence of unusual circumstances, in fact, the transfer was her idea.

To the extent Defendants move for summary judgment on any other claims of constructive discharge, the motion is denied. All other complainants that present a constructive discharge claim present a genuine issue of material fact on the issue because, for example, many suffered gradually increasing adverse employment actions when they either complained of or refused Price's sexual harassment. A jury could infer that Price intended to make them quit by gradually making their work conditions so intolerable that they quit. He even expressed such a sentiment on a number of occasions. (*See, e.g.*, Fagan Dep. at 239:3–9, Doc. 128-4 ("He [Price] made it clear to everybody, or at least the servers that were on shift that morning, that Ashley Harry had filed a sexual harassment complaint and that he was going to make her life hell to where she quit.")).

**G) Emotional distress damages**

Defendants move for summary judgment on claims for emotional-distress damages for five of the claimants: Harry, Fagan, Jones, Hessler, and Heightland. Defendants argue that "a plaintiff must present evidence of physical manifestations or other corroborating evidence to support her testimony regarding emotional distress." (Defs.' Mot. Summ. J. at 80, Doc. 119). But Defendants' rule isn't supported by the cases they cite.

A plaintiff must support emotional-distress damages with competent evidence. *Carey v. Piphus*, 435 U.S. 247, 267 n.20 (1978). A plaintiff's own testimony may be sufficient to demonstrate emotional distress, *Lentz v. City of Cleveland*, 694 F. Supp. 2d 758, 769 (N.D. Ohio 2010), but if a plaintiff relies exclusively on her own testimony, that testimony must include "specific and definite evidence of her emotional distress," and not simply conclusory statements, *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 472 (6th Cir. 2009) (applying Michigan law); *see also Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001) (reducing award for emotional-distress damages to $150,000 when plaintiff relied primarily on his own testimony in Americans with Disabilities Act litigation). For example, a plaintiff being "highly upset" about slurs, saying "you can only take so much" was insufficient to support an award of emotional-distress damages.

10

*Erebia v. Chrysler Plastic Prod. Corp.*, 772 F.2d 1250, 1259 (6th Cir. 1985). But similar vague testimony supported by specific examples of how discrimination contributed to a plaintiff's emotional distress is sufficient to support an award of emotional-distress damages. See *Moore v. KUKA Welding Sys.*, 171 F.3d at 1082–83 (describing a steady stream of racial jokes and slurs and isolation from coworkers). But even specific evidence may be undermined by a plaintiff's concession that she did not feel harassed. *See Betts*, 558 F.3d at 473.

> [T]he temporary nature of Lentz's emotional harms and the fact that Lentz did not lose his job compel the conclusion that the jury award here was greater than the maximum amount the trial evidence reasonably supports. The absence of evidence regarding physical manifestations of his emotional harms further compels such a conclusion.

*Lentz*, 694 F. Supp. 2d at 770. In *Lentz*, the district court found that an emotional distress award of $200,000 was supported by a record with "little evidence of physical manifestations of emotional distress." *Id.* Far from requiring proof of physical manifestations of emotional distress at summary judgment, *Lentz* shows that a plaintiff may receive damages without any physical manifestations of their emotional distress. In Defendants' second case, *Betts*, the Sixth Circuit specifically stated that "medical evidence [was] not necessary," 558 F.3d at 472, and held that the plaintiffs failed "as a matter of Michigan law to present sufficient 'specific and definite evidence' of emotional distress," *Id.* at 474 (6th Cir. 2009) (quoting *Moody v. Pepsi-Cola Metro. Bottling Co.*, 915 F.2d 201, 210 (6th Cir. 1990)). The *Betts* plaintiffs provided testimony similar to that in *Erebia* where the court held that such generalized complaints could not support a finding of emotional distress. *Id.* at 472–73. To summarize, a claim for emotional-distress damages must be supported by competent evidence, which is evidence that is specific and definite, but a plaintiff does not need to present evidence of physical manifestations to survive summary judgment.

Here, the complainants lack serious physical manifestations of emotional distress, but those aren't necessary. The following complainants present genuine issues of material fact as to emotional damages.

Harry: while Harry may not have long-lasting emotional damage, her reaction to the incident where Price took her phone, accessed her pictures without her permission, found nude pictures of her, and made sexual comments about them in front of her, presents evidence of "stress,

mental anguish, embarrassment, and humiliation." *Houston v. U.S. Bank Home Mortgage Wisconsin Servicing*, 505 F. App'x 543, 549 (6th Cir. 2012).

Fagan: Fagan had sex with Price three times while employed at Texas Roadhouse, and testified that she felt taken advantage of and was vulnerable at the time due to her being "in a bad place." She testified that she continued the relationship with Price because she couldn't see how she could get out of it and keep her job. Fagan also testifies to feeling like less of a person after she had sex with Price. Fagan presents a genuine dispute of material fact as to the cause of her emotional distress. On the one hand, she was anxious and stressed because of marital and financial problems. On the other hand, Price knew about and took advantage of her anxious state. Eventually she gave in to his sexual advances, which caused her emotional distress particularly because of the prospect of joblessness if she didn't accept his advances, as she thought "where will my family be?" (Fagan Dep. 272:3–11, Doc. 128-4).

Jones: Defendants are correct that Jones presents no physical manifestations of emotional harm, nor did she seek medical attention, nor does she claim that she currently feels emotionally affected by her time at Texas Roadhouse. But Jones does claim she was affected emotionally when she did work at Texas Roadhouse. Jones presents evidence that every single day she was uncomfortable at work because she expected to be harassed in some way. Critically, Jones testified to feeling scared and nervous when presented with Price's offer to let her keep her job if she "made out" with him and intimidated by him shutting the door to his office when she refused him. Similarly to Harry, Jones doesn't present evidence of long-lasting emotional damage from Price's harassment, but she does present a genuine issue about suffering stress, anxiety, and humiliation while on the job. But actions speak louder than words: Jones sought a transfer due to Price and the toll it took on her mental state.

Hessler: Like the others, Hessler has no mental illness, but unlike the others, Hessler presents some physical manifestations of her emotional distress: she cried frequently after Price's sexual comments to her. She also testified that "It's still extremely disturbing to even speak about it." (Hessler Dep. at 218:1–16, Doc. 128-17). Hessler also presents evidence that she was humiliated by Price making vulgar comments to her in front of other staff members. There is ample evidence from which to infer her mental state as well: her complaints to corporate, her search for other employment, and her testimony about how she would have sought professional

help for her mental distress if not for the cost. In short, Hessler presents a genuine issue of material fact as to emotional-distress damages.

Heightland: Defendants point to Heightland's mental toughness and her lack of a need for counseling as evidence that she didn't suffer any actionable emotional distress. Heightland's mental toughness perhaps only serves to amplify the signals of emotional distress she does provide: she was constantly uncomfortable working with Price, she was too afraid and intimidated by him to complain, and she ultimately resigned. After resigning, her relationships suffered as she withdrew from those around her, arguably a sign of some emotional distress. This evidence presents at least a genuine issue of material fact as to whether Heightland suffered emotional distress.

### H) Untimely claims

Defendants argue that some claims are untimely, specifically Brown's claims about co-worker harassment, Faller's claims about co-worker harassment, and Hessler's claims about Price's harassment. To the extent Brown brings a claim for co-worker harassment, that claim fails. Brown alleges minimal contact with co-workers that is severe or pervasive, so she fails to show a hostile work environment due to her co-workers. However, Faller's claims present a genuine issue of material fact on this issue, and therefore the Court must consider whether her claim is saved by the single-filing rule.

An aggrieved party has 300 days from the time of discrimination to file a charge with the EEOC. 42 U.S.C. § 2000e-5(e). Timely filing of an EEOC complaint is a prerequisite to a Title VII suit. *Id.* "But where a substantially related non-filed claim arises out of the same time frame as a timely filed claim, the complainant need not satisfy Title VII's filing requirement to recover." *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 840 (6th Cir. 1994). Similar claims, even claims filed by employees who never worked together, fall under the single-filing rule. *See id.* "The purpose of the requirement is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *E.E.O.C. v. Taco Bell Corp.*, 575 F. Supp. 2d 884, 890 (W.D. Tenn. 2008) (*Dixon v. Ashcroft,* 392 F.3d 212, 217 (6th Cir. 2004)). Therefore, when a work unit is "of modest size . . . mere similarity of the grievances within the same general time frame suffices to permit the 'single filing rule.'" *Howlett v. Holiday Inns, Inc.*, 49 F.3d 189, 195 (6th Cir. 1995).

Here, the EEOC's notice of determination letter informed Defendants that it found a class of female employees was harassed by Price, and other co-workers. The investigation showed some conduct by co-workers such that the EEOC could attempt to conciliate the claims regarding both Price and the co-workers. Faller's claim against her co-workers is similar to the claims against Price and occurred around the same time. Therefore, the single-filing rule applies to save this claim.

The issue with Hessler's claim is slightly different. Defendants argue that Hessler's claims are time-barred because they all occurred before she quit in October 2008, well before the 300 day period preceding Rieser's EEOC complaint, filed March 9, 2010.

A single plaintiff may recover for a hostile work environment claim that extends well beyond the 300-day EEOC filing period as long as one act of that same hostile work environment occurred within the 300-day period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, (2002). For Hessler, that's impossible, because the last possible day she experienced a hostile work environment was the day she quit, which was months before the 300 day period even began. Here, the EEOC argues, that same hostile work environment that Hessler describes continued and is the same environment described in the timely filed EEOC charge. The EEOC argues that the Sixth Circuit found that this "common practice of sexual harassment," *Wilson Metal Casket*, 24 F.3d at 140, "constitutes a single, common hostile work environment practice" such that the continuing violation doctrine announced in *Morgan* should apply to allow all aggrieved employees to make a claim if it falls under the same hostile work environment. (Pl.'s Resp. at 266).

Defendants read *Morgan* differently. Here's the important line: "Provided that an act contributing to *the claim* occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117 (emphasis added). Defendants read the word "claim" in *Morgan* to mean individual claim, and since Hessler can allege no act contributing to her claim within the filing period, her claim is untimely.

Both sides have good arguments, but the Sixth Circuit's expansive understanding of hostile work environment claims, and the unique nature of EEOC class claims counsels for permitting Hessler's hostile-work-environment claim, but not her retaliation claim. First, "courts should aggregate hostile work environment claims, considering even those claims that were not directed

14

at a particular plaintiff and those claims that a particular plaintiff did not witness." *Berryman*, 669 F.3d at 718. This, coupled with *Morgan* favors an expansive, rather than "myopic," view of hostile-work-environment claims. *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999). Second, when the EEOC files a class-action suit, *Wilson Metal Casket* gives wide latitude to other complainants when their "substantially related non-filed claim arises out of the same time frame as a timely filed claim," holding in that case, "the complainant need not satisfy Title VII's filing requirement to recover." 24 F.3d at 840. It is true that *Morgan* spoke of a continuing violation for a single "claim." The procedural requirements for bringing a claim about that environment are dictated to some extent by the expansive view of a hostile work environment, one that looks to the totality of the circumstances rather than the granular level of each discrete act. Here, the EEOC brings a class action, alleging an essentially uninterrupted hostile work environment. Because Hessler alleges she suffered from the same environment that other women suffered from, hers is a claim about essentially the same hostile work environment.

However, Hessler's retaliation claim fails because a termination, even a constructive discharge, does not get the same expansive treatment as hostile-work-environment claims. *See Morgan*, 536 U.S. at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). This discrete claim falls outside of the filing period and is therefore untimely.

### G) Conciliation

Defendants' argue the Court should stay the matter and order the EEOC to "conciliate" its claims against them as required by Title VII. The Court declines because the EEOC complied with the bare bones conciliation requirements in Title VII.

#### 1) Motion to strike conciliation information

The Court must sift through the information presented and exclude that which should not have been presented to the Court. The EEOC moves to strike conciliation information included in Defendant's motion for summary judgment and a supporting exhibit. (Doc. 138). And the Court will strike most but not all of the conciliation information that the EEOC identifies.

Title VII requires the EEOC "to endeavor to eliminate . . . unlawful employment practice[s] by informal methods of "conference, conciliation, and persuasion" against employers rather than rushing straight to the courthouse. *See* 42 U.S.C. § 2000e-5(b). "Nothing said or done

during and as a part of such informal endeavors may be . . . used as evidence in a subsequent proceeding without the written consent of the persons concerned." *Id.* But since courts enforce the conciliation requirement, courts must know something. *See Mach Mining, LLC v. E.E.O.C.*, 135 S. Ct. 1645, 1656 (2015). "[A] court looks only to whether the EEOC attempted to confer about a charge, and not to what happened (*i.e.,* statements made or positions taken) during those discussions." *Id.* This solution is best illustrated by an email. While no one can disclose the contents of a conciliation-attempting email, the information in its heading—the "To", "From", "Subject", and "Date" fields—provides the Court with enough information to determine that the EEOC has leapt its (admittedly low) hurdle of conciliation.

So, the EEOC asks the Court to strike certain information from the Defendants' motion and a supporting declaration.

> From the Summary Judgment Memorandum:
> • On page 1 of the Summary Judgment Memorandum (Doc 119, PID 1088), the second sentence of the first paragraph and the first line of the second paragraph;
> • On page 8 (DOC 119, PID 1095), the first, second, third, fourth, and seventh sentences of Section II.C.3;
> • On page 14 (DOC 119, PID 1101), the entirety of the last paragraph;
> • On page 15 (DOC 119, PID 1102), the entirety of the second paragraph.
>
> From the Burgan Declaration:
> • On page 3 (DOC 119-27, PID 1494), the entirety of ¶ 15;
> • On page 4 (DOC 119-27, PID 1495), the last sentence of ¶ 16.

(EEOC's Mot. Strike Conciliation Information at 1–2, Doc. 138).

The Court will not strike information that does not disclose the contents of the parties' conciliation efforts. For example, the Court parses certain evidence, like the Burgan Declaration at paragraph 15, and strikes the material that discloses the substance of the parties' conciliation efforts but does not strike the material that shows the EEOC made a demand at all. The Court GRANTS the balance of the motion to strike conciliation information.

### 2) Substance of conciliation issue

Having stripped away the unlawful conciliation information, the Court is left with only the skeleton of a conciliation conversation, but these bare bones are all the Court needs. One: the EEOC must "inform the employer about the specific allegation, as the Commission typically does in a letter announcing its determination of 'reasonable cause.'" *Mach Mining*, 135 S. Ct. at 1655–56. Two: "the EEOC must try to engage the employer in some form of discussion (whether

written or oral) so as to give the employer an opportunity to remedy the allegedly discriminatory practice." *Id.* at 1656. Three: The EEOC must provide notice of failure to conciliate. *Id.* at 1653.

Here, the Court has the bookend letters plus an attempt to settle. The first letter is the EEOC determination letter; the last letter is the notice-of-failed-conciliation letter. And the EEOC at least offered settlement terms after it sent the first letter and before it sent the last. Defendants claim the EEOC's conciliation "attempt" was a sham and that it never negotiated in good faith. Defendants may be right, but *Mach Mining* prohibits a court from doing "a deep dive into the conciliation process." *Id.* at 1653. The Court doesn't have license to dive into these issues and only looks for the bare compliance with the conciliation requirement outlined by *Mach Mining*. And here, the EEOC met that requirement.

Therefore, the Court denies Defendants' motion to stay and order conciliation.

### III) Conclusion

Therefore, Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. (Doc. 119).

- Summary judgment is granted on the following complainants' retaliation claims: Stover, Brown, Fagan, and Hessler.
- Summary judgment is granted on the following complainants' constructive discharge claims: Stover, Fagan, and Jones.
- The balance of Defendants' motion for summary judgment is denied.

Defendants' motion to strike conciliation information is **GRANTED IN PART AND DENIED IN PART**. (Doc. 138).

Defendants' motion to strike the EEOC's response memorandum is **DENIED** as moot. (Doc. 137).

Defendants' motion for continuance of final pretrial and trial dates is **DENIED**. (Doc. 147). The basis for the motion was the then-pending motion for summary judgment.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: September 2, 2016

17